**Scott B. BRADY, Petitioner,**

v.

**UNEMPLOYMENT COMPENSATION BOARD OF REVIEW,**
Respondent.

Commonwealth Court of Pennsylvania.

Submitted on Briefs Feb. 9, 1999.
Decided April 6, 1999.

**3.** We know of no cases that have decided this question, and we do not decide it herein.

Patricia A. Henry, Pittsburgh, for petitioner.

Lisa Garrett Harry, Pittsburgh, for intervenor, Indiana Hospital.

Before COLINS, President Judge, FRIEDMAN, J., and NARICK, Senior Judge.

NARICK, Senior Judge.

The issue on appeal is whether the decision of the Unemployment Compensation Board of Review (Board) denying benefits to Scott B. Brady (Brady) due to his alleged willful misconduct for failure to report to work is supported by substantial evidence and is in accordance with the law. Because Brady did not establish he had good cause for missing work, the Board's decision is affirmed.

The relevant facts in this case are as follows. Brady has been employed as a full-time washing machine operator by Indiana Hospital (Hospital) from January 15, 1990 until present. At the time of his hire, Brady was informed he had to work every fifth Sunday as part of his job responsibilities and for six years Brady did work every fifth Sunday without incident. During the latter portion of his employment, Brady refused to

work on Sundays because he wished to attend church services on Sundays from 9:45 a.m. to 2:00 p.m. The hospital agreed to permit Brady to have scheduled Sundays off provided that he found another employee to cover his shift. The hospital has an unwritten policy that prohibits employees from taking personal days on Sundays.

In both March 1997 and February 1998 Brady was unable to find coverage for his scheduled Sunday, did not report to work, and was suspended for three days on each occasion.

Brady was scheduled to work on Sunday March 8, 1998. He was unsuccessful in finding another employee to cover his shift and the hospital refused his request for a personal day. On Saturday, March 7, 1998, Brady's immediate supervisor called Brady at work and informed him of a temporary solution decided by Hospital management. That temporary solution was Brady was to work four (4) hours on Sunday, March 8, 1998 from 5:00 a.m. to 9:00 a.m. and four (4) extra hours throughout the week. This solution allowed Brady to attend his desired church services while not missing any time from work.

When Brady was informed of the solution by his supervisor, Brady requested that the proposal be reduced to writing. An e-mail message confirming the Hospital's solution was sent to Brady; however, Brady did not receive it on Saturday because by the time the e-mail reached his computer Brady had left work for the day.

Brady ultimately failed to report to work at all on Sunday, March 8, 1998 and the Hospital suspended Brady for three (3) days. Brady filed a claim for unemployment compensation benefits with the Office of Employment Security (EOS), which denied benefits under 43 P.S. § 802(e).[1] Brady appealed that decision to a referee, which reversed the decision of the EOS and granted Brady benefits. Hospital appealed the referee's decision to the Board, which reversed the decision of the referee and found that Brady's failure to

---

1. 43 P.S. § 802 states:
   An employee shall be ineligible for compensation for any week—
   (e) In which his unemployment is due to his discharge or temporary suspension from work

for willful misconduct connected with his work, irrespective of whether or not such work is 'employment' as defined in this act. . . .

report to work constituted insubordination and willful misconduct. Brady then filed a petition for review of the Board's decision with this Court.

On appeal[2], Brady argues he had good cause for missing work on Sunday, March 8, 1998 because his sincerely held religious beliefs required him to attend church services. Brady asserts that the Board's denial of unemployment compensation benefits violated his rights protected by the Free Exercise clause of the First Amendment of the United States Constitution. Finally, Brady argues that the Board erred in rejecting the referee's findings.

█ In the case at bar, this Court need not address the First Amendment argument raised by Brady. First, this Court should not decide constitutional issues where the matter can be decided on other grounds. *Lattanzio v. Unemployment Compensation Board of Review,* 461 Pa. 392, 336 A.2d 595 (1975). Second, Brady was suspended for missing work that would not have interfered with his ability to attend the desired church services. Finally, Brady admits several times in the record that the only reason he did not report to work on Sunday, March 8, 1998 was because Hospital's proposal that he work from 5:00 a.m. to 9:00 a.m. was not reduced to writing. That reason has nothing to do with one's First Amendment rights.

█ The employer, in this case Hospital, bears the burden of proving an employee committed willful misconduct,[3] which would disqualify him from unemployment benefits. *Hershey v. Unemployment Compensation Board of Review,* 146 Pa.Cmwlth. 255, 605 A.2d 447 (1992).

█ In the case at bar, Brady concedes that Hospital has a policy requiring laundry department employees to work every fifth Sunday and that he violated that policy by refusing to work his scheduled Sunday shift. On March 8, 1998 Brady failed to report to work in direct violation of his immediate supervisor's order. Therefore, this Court holds Brady committed insubordination and willful misconduct.

█ Once it is determined that an employee has committed willful misconduct the burden is on the employee to prove that good cause existed for that conduct. *Ramsey v. Unemployment Compensation Board of Review,* 58 Pa.Cmwlth. 288, 427 A.2d 1249 (1981). Brady admits in his deposition several times that the only reason that he did not report to work as directed on March 8, 1998 was because Hospital's proposal was not reduced to writing. This Court holds that refusing a reasonable order because it is not reduced to writing is not good cause for willful misconduct. An employer has the right to deal with its employees on a non-written basis and the right to expect that reasonable oral requests be carried out by employees.

█ Accordingly, this Court holds that Brady did not establish that he had good cause for his willful misconduct.

Finally, Brady argues that the Board rejected a finding by the referee without articulating any reason for doing so. Specifically, Brady challenges the finding of the Board that Brady rejected the proposal by Hospital because it was not in writing. Brady cites *Treon v. Unemployment Compensation Board of Review,* 499 Pa. 455, 453 A.2d 960 (1982), for the proposition that the Board may not disregard the findings made by a referee which are based on uncontradicted and consistent testimony without stating its reasons for doing so. .

---

2. Whether employee has been suspended for willful misconduct disqualifying employee from unemployment benefits is a question of law subject to review by this Court, and where employer, bearing the burden of proof, has prevailed below, the scope of review is limited to determining whether error of law has been committed or whether necessary findings of fact are unsupported by substantial evidence. *Hershey v. Unemployment Compensation Board of Review,* 146 Pa. Cmwlth. 255, 605 A.2d 447 (1992).

3. "Willful misconduct" is an act of wanton or willful disregard of employer's interest, deliberate violation of employer's rules, disregard of standards of behavior which employer has the right to expect of employees, or negligence indicating intentional disregard of employer's interests or of employee's duties and obligations to employer. *Lee Hospital v. Unemployment Compensation Board of Review,* 139 Pa.Cmwlth. 28, 589 A.2d 297 (1991).

The law is well settled in Pennsylvania that the Board is the ultimate fact-finder in unemployment cases. *Gioia v. Unemployment Compensation Board of Review,* 661 A.2d 34 (Pa.Cmwlth.1995). The Board found that Brady refused to report to work on March 8, 1998 because the proposal had not been reduced to writing in a timely fashion. There is substantial evidence in the record, including Brady's own admission, to support that conclusion.

The referee found that the reason Brady refused the proposal by Hospital was because he did not feel it was valid because it was not reduced to writing. The Board found Brady refused the proposal because it had not been reduced to writing in a timely fashion. Any factual distinction between the two findings is not relevant to the above legal analysis of the case.

According, the decision of the Board in affirmed.

### ORDER

AND NOW, this 6 th day of April, 1999, the order of the Unemployment Compensation Board of Review in the above-captioned matter is hereby affirmed.

FRIEDMAN, Judge, dissenting.

I respectfully dissent. Unlike the majority, I believe that Scott B. Brady (Claimant) had good cause for missing work on Sunday, March 8, 1998. Therefore, I would conclude that there is no willful misconduct here, and I would reverse the order of the Unemployment Compensation Board of Review (UCBR) denying Claimant unemployment compensation benefits.

In determining whether an employee's actions constitute willful misconduct, it is necessary to consider *all* of the circumstances, including the reasons for the employee's noncompliance with the employer's directive. *Rebel v. Unemployment Compensation Board of Review,* —— Pa. ——, 723 A.2d 156 (1998). If an employee's conduct is *reasonable* under the circumstances, then the employee had good cause for the conduct, and there is no willful misconduct. *Id.*

I believe that Claimant's conduct was reasonable under the circumstances here. Indeed, this court has held that where an employer has long been aware of an employee's religious beliefs and has accommodated them in the past, where the employer receives two weeks advance notice that the employee must be absent from work due to a religious observance and where the employee fails to report for work despite the employer's directive to do so, the employee's absence from work does *not* constitute willful misconduct. *Southeastern Pennsylvania Transportation Authority v. Unemployment Compensation Board of Review,* 54 Pa.Cmwlth. 165, 420 A.2d 47 (1980) (hereinafter *SEPTA* ).

### I.

In this case,[1] Claimant would not work on Sunday because he wished to attend church services from 9:45 a.m. to 2:00 p.m. (UCBR's Findings of Fact, Nos. 5–6; R.R. at 27a.) Claimant testified that he "was trying to be obedient to the Lord and go to church." (R.R. at 28a.) To Claimant, the need to be in church on Sunday to "worship the Lord" was a "sincere Bible belief." (R.R. at 27a, 36a.) Claimant stated that "as a Christian the Bible clearly preaches that we ought to be in the House worshiping the Lord on his day and not doing other things." [2] (R.R. at 27a.)

---

1. The UCBR failed to make necessary findings of fact as to *all* of the circumstances surrounding Claimant's conduct in this case. Thus, in setting forth the facts here, it is necessary to draw upon relevant and undisputed evidence from the record.

It is also necessary to consider certain referee's findings that the UCBR has disregarded without explanation. The UCBR may not "simply disregard findings made by the referee which are based upon consistent and uncontradicted testimony without stating its reasons for doing so."

*Treon v. Unemployment Compensation Board of Review,* 499 Pa. 455, 461, 453 A.2d 960, 962 (1982).

2. The UCBR found that Claimant failed to identify his denomination and failed to establish that his religion required him to be at church on Sunday. (UCBR's Findings of Fact, No. 7.) However, the UCBR did not make a credibility determination adverse to Claimant, and no one challenged the sincerity of Claimant's beliefs and practices.

Indiana Hospital (Employer) initially was unwilling to accommodate Claimant's religious preferences.[3] On March 10, 1997, Claimant asked for time off on Sunday, March 23, 1997 to attend church. The written request indicated that a co-worker had agreed to switch shifts with Claimant on that day. However, Employer refused to approve the switch and suspended Claimant for three days when he failed to report to work on March 23, 1997. (R.R. at 25a, 45a; O.R., Item No. 8, Claimant's exh. 3.) In April 1997, Claimant asked Employer to allow Claimant's co-worker to switch shifts with him *permanently,* but Employer refused to approve such an arrangement. (R.R. at 29a–30a.)

Claimant subsequently complained to the Pennsylvania Human Relations Commission (PHRC) about Employer's discrimination against Claimant based on his religious beliefs, and the PHRC was actively investigating the matter. (R.R. at 25a.) At some point, Employer permitted Claimant to trade shifts with other employees so that Claimant could attend church services on Sunday. Employer placed the onus on Claimant to find a replacement, but Employer was willing to pay overtime to those who agreed to work for Claimant on Sunday. (R.R.. at 24a.)

In February 1998, Claimant could not find someone to trade shifts with him and, thus, was compelled to request time off. Employer denied Claimant's request and suspended Claimant for three days when he failed to report to work for his scheduled Sunday shift. (R.R. at 18a, 46a.)

Claimant knew that he would be unable to work his scheduled shift on Sunday, March 8, 1998, because of his desire to attend church services. Once again, Claimant was unable to find a replacement.[4] Claimant requested personal leave for March 8, 1998 *two* weeks in advance. This request was in full compliance with Employer's *written* leave policy, which requires that an employee request personal leave *one* week in advance.[5] (O.R., Item No. 8, Claimant's exh. 4.) Employer denied the request. (UCBR's Findings of Fact, No. 9.)

Having denied Claimant's request for personal leave, Employer anticipated that Claimant would not appear for work on March 8, 1998. On Friday, March 6, 1998, Employer held a management meeting to discuss how to "cover" Claimant's shift on that Sunday and how to permanently resolve the problem without terminating Claimant's employment. Employer decided to offer Claimant the option of working a split shift on March 8, 1998. (R.R. at 19a.) On Saturday, March 7, 1998, Employer contacted Claimant at about 9:00 a.m. and proposed that Claimant work a four-hour shift on Sunday, March 8, 1998, and use personal time for the remaining hours, or work the rest of his shift at a later date.[6] (UCBR's Findings of Fact, No. 11; R.R. at 39a.)

Because of the PHRC investigation and because Employer had lied to the PHRC during the course of the investigation,[7] it had

---

3. The majority gives the impression, which is contrary to the record, that Employer always accommodated Claimant's religious beliefs by allowing Claimant to find a substitute for his Sunday shift. (Majority op. at 1200.)

4. Although Employer originally agreed to pay overtime to those who substituted for Claimant on Sunday, Employer later refused to pay overtime. Employer insisted that everyone work a five-day schedule with no overtime. After Employer removed the overtime incentive, it became more difficult for Claimant to find workers who would substitute for him on Sunday. (R.R. at 26a, 30a.)

In addition, I note that Employer had three or four full-time employees in the laundry and two part-time employees. At the hearing, Employer could not explain clearly why the part-time employees were unable to substitute for Claimant on Sunday. (*See* R.R. at 35a–36a.)

5. Employer has an *unwritten* policy prohibiting the use of personal leave on weekends. (Referee's Findings of Fact, No. 3; R.R. at 34a.)

6. Prior to this time, Employer had never allowed Claimant to work a split shift or to use personal time on Sunday. (Referee's Findings of Fact, No. 17.)

7. Claimant testified that he "had to resort to having things documented" because Employer was lying to the PHRC about Employer's efforts to accommodate Claimant's religious beliefs and about Claimant's efforts to resolve the situation. (R.R. at 25a–26a.) Employer had reported in a letter to the PHRC that: (1) Claimant turned down an offer from Employer to work in a posi-

become common practice for Claimant to ask Employer to put into writing any offer by Employer to accommodate Claimant's religious preferences. (Referee's Findings of Fact, No. 14.) Thus, on this occasion, Claimant asked Employer to put the proposal in writing, and Employer agreed to do so "within a half hour to an hour." (R.R. at 25a.) Claimant waited, expecting to receive Employer's proposal in writing by 10:00 a.m. Claimant checked his email every half-hour, but, when Claimant completed his shift at 2:30 p.m., Claimant had *nothing* from Employer in writing.[8] Because Employer did not put its proposal in writing, Claimant believed that the offer was no longer valid and that Employer expected him to work the full shift on March 8, 1998. (UCBR's Findings of Fact, No. 12; Referee's Findings of Fact, No. 17.)

Claimant did not report to work on March 8, 1998 because he wanted to attend church services in accordance with his religious beliefs.[9] (UCBR's Findings of Fact, No. 17; Referee's Findings of Fact, No. 23.) Employer suspended Claimant for three days for an unexcused absence from work and for insubordination.[10] (UCBR's Findings of Fact, No. 14; UCBR's op. at 3; R.R. at 40a.)

**II.**

The majority holds that "refusing a reasonable order because it is not reduced to writing is not good cause for willful misconduct.[11] An employer has the right to deal with its employees on a non-written basis and the right to expect that reasonable oral requests be carried out by employees." (Majority op. at 1201.) However, in setting forth this holding, the majority fails to consider *all* of the circumstances in this case and ignores this court's holding in *SEPTA.*

In *SEPTA,* a bus driver believed according to the tenets of his faith that he must not work on the holy day of Rosh Chodesh, which occurs every twenty-eight to thirty days. About two weeks before Rosh Chodesh, the bus driver asked to be excused from work on that date. The request was denied, and the bus driver was admonished to report to work or be subject to dismissal. The bus driver did not report to work due to his religious beliefs and was discharged. This court held that where an employer has long been aware of an employee's religious beliefs and has accommodated them in the past, giving two weeks advance notice of the need to be absent from work for religious observance is *not* a willful disregard of the standards of behavior an employer has a right to expect of employees.

I find *SEPTA* to be persuasive here. Claimant informed Employer two weeks in advance that he could not find a substitute for his shift on Sunday, March 8, 1998. Employer had been aware of Claimant's religious beliefs for a long time and had made accommodations for them.[12] In fact, at the March 6, 1998 meeting, Employer was trying to find a way to *permanently* accommodate Claimant's religious beliefs. (*See* UCBR's Findings of Fact, Nos. 15–16; R.R. at 19a.)

---

tion that did not require weekend work; and (2) Claimant made no effort to seek another position with Employer that did not require weekend work. (O.R., Item No. 8, Claimant's Exhibit No. 2, Employer's 1/5/98 letter to the PHRC.) At the hearing, Employer did not deny that it had lied to the PHRC.

**8.** Claimant last checked his email at 2:26 p.m. Employer sent an email to Claimant at 3:48 p.m., *after* Claimant completed his shift on March 7, 1998. (R.R. at 26a, 39a.)

**9.** The UCBR found that Claimant did not report to work "when a reasonable accommodation was suggested." (UCBR's Findings of Fact, No. 17.) However, because Employer did not communicate the accommodation to Claimant in writing before the end of Claimant's shift on March 7,

1998, Claimant reasonably thought that Employer withdrew its accommodation offer.

**10.** An unexcused absence from work ordinarily results in a consultation or written notice. (R.R. at 43a.) Insubordination ordinarily results in suspension. (R.R. at 42a.)

**11.** The question here is *not* whether Claimant had "good cause for willful misconduct." If Claimant had good cause for missing work on March 8, 1998, then there was no willful misconduct. *Rebel.*

**12.** Employer allowed Claimant to find a substitute to work his Sunday shift and, for a period of time, had paid overtime to those who worked for Claimant on Sunday. Sometime before March 1998, Employer refused to pay overtime.

The PHRC was even involved in negotiations between Employer and Claimant to resolve the difficulties. Under these circumstances, I would conclude that Claimant's absence from work on March 8, 1998 to attend church services does *not* rise to the level of willful misconduct. *SEPTA.*

Employer's *attempt* to offer Claimant the option of working a split shift on March 8, 1998 does not alter my conclusion. Because of the PHRC investigation, both Claimant and Employer had to make a record of their actions. Thus, Claimant's request to have Employer reduce its offer to writing was reasonable. Employer evidently thought so because Employer *agreed* to put its offer in writing *within a half-hour to an hour.* When Claimant received nothing from Employer before the end of his shift, Claimant concluded that Employer's offer was no longer valid. This conclusion was certainly reasonable given the fact that Employer's offer made new concessions to Claimant. Indeed, Employer had never allowed Claimant to use personal leave or to work a split shift on Sunday. Because there was not a valid offer from Employer to accommodate Claimant's religious beliefs, Claimant's absence from work on March 8, 1998 for religious reasons does not constitute willful misconduct.

Accordingly, I would reverse.

